UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,         18-CR-6015

    v.                              NOTICE OF MOTION FOR
                                  IMMEDIATE RELEASE AND RESENTENCE
JASON HAYNES
            Defendant.
_____

| | |
|---|---|
| **MOTION BY:** | William T. Easton, Attorney for Defendant |
| **DATE, TIME & PLACE:** | Honorable Elizabeth A. Wolford<br>United States District Court Judge,<br>Kenneth Keating Building<br>Rochester, New York<br>At a date and time to be set by the Court |
| **SUPPORTING PAPERS:** | Affirmation of William T. Easton<br>dated April 10, 2020. |
| **RELIEF REQUESTED:** | Emergency Motion For Order Reducing Sentence/<br>Modifying Judgment To Allow Remainder Of<br>Sentence To Be Served On Home Confinement<br>Pursuant To 18 U.S.C. § 3582(C)(1)(A)(i). |
| **DATED:** | Rochester, New York, April 10, 2020. |

Respectfully submitted,

**/s/ William T. Easton**
William T. Easton
Easton Thompson Kasperek Shiffrin, LLP
16 W. Main Street, Suite 243
(585) 423-8290
wteaston@etksdefense.com

To: Richard A. Resnick
     Assistant United States Attorney

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

**ERROR! REFERENCE SOURCE NOT FOUND.**,

            Defendant.

18-CR-6015

AFFIRMATION

**WILLIAM T. EASTON,** affirms under penalty of perjury that:

1. I am an attorney duly admitted before this Court and represent Mr. Haynes in this matter. I also represented him at his plea of guilty before this Court on December 10, 2018 and at sentencing on July 25, 2019. I am fully familiar with the facts of this case.

## Introduction

2. Mr. Haynes was sentenced to six months incarceration to be followed by three years of supervised release (the first six months with a home confinement component).

3. Mr. Haynes began his sentence on November 19, 2019 by self-surrendering to Montgomery Prison Camp in Montgomery Alabama. ("MPC"). The self-surrender date had been adjourned by the Court to accommodate Mr. Haynes medical issues[1].

4. The Bureau of Prisons ("BOP") has calculated Mr. Haynes release date as May 15, 2020, which is the full six month term and has not adjusted this term as of today's date.

5. Jason Haynes is among those at highest risk of death or serious illness if he is exposed to COVID-19. His enhanced vulnerability stems from his serious medical conditions.

---

[1] See letter from William Easton to Hon Elizabeth A. Wolford dated August 23, 2019 attached hereto as **Exhibit A**.

Many of these medical issues relate to surgeries he underwent in 2017 and 2018 to address injuries he suffered from a motor vehicle accident.

6.      These surgeries involved the removal of the first rib on both the left and right side of his lungs. The radiology report prepared in conjunction with these surgeries indicated "opacities" associated with scarring of the lungs and atelectasis (collapsed lung)[2]. Over the past two years Mr. Haynes has received extensive medical treatment regarding these issues and other issues relating to his condition.

7.      As the COVID-19 virus has spread throughout the BOP system, Mr. Haynes has applied to be released to serve the remainder of his sentence at his residence in Ormond Beach Florida where he resides with this wife Traci Herring (a Registered Nurse) and their two children. On April 7, 2020 he also applied for "compassionate release"

8.      As of today's date, neither MPC nor BOP has responded to these applications, nor have they responded to counsel's telephone calls and letter, and neither has adjusted Mr. Hayne's release date which remains May 15, 2020.

9.      Based on Mr. Haynes susceptibility to contracting the COVID-19 disease while detained in a prison where the conditions necessarily increase the risk to inmates and staff, as well as his unique vulnerability of severe harm or death[3] if he contracts the disease, the Court should

---

[2] Final Report from Dr. Rose, verified by Dr. Rush regarding CT Chest scan a copy of which is attached hereto as **Exhibit B**. This report was provided to MPC counselor Taylor on April 8, 2020 a copy of the cover letter attached hereto as **Exhibit C**.

[3] According to the WHO and the CDC, Mr. Haynes belongs to the highest risk group because of he suffers from a lung ailment which is similar to asthma. People with asthma are directed to take extra precautions when any type of respiratory illness is spreading in their community. The CDC has released guidelines for people at high risk (including people with asthma):
- Stock up on supplies (a 14 to 30 day supply)
- Take steps to keep a distance from others (social distancing, about 6 feet)
- Avoid people who are sick, limit close contact and wash your hands often

order his immediate release under the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A), Pub. L. No. 115-391, 132 Stat. 5194 (2018) (hereafter "FSA") because of extraordinary and compelling circumstances.

10. Given the urgency of the situation before the Court, which increases day-by-day as the BOP documented infection rate increases at an exponential rate, Mr. Haynes requests expedited treatment of his motion.

11. I have kept Mr. Resnick informed of this issue and provided him the medical documentation. He has stated that he can be ready to respond to this motion in an expedited manner given his familiarity with the substantial nature of Mr. Haynes's medical issues and the need for prompt action. He authorized me to convey this to the Court.

**Statement of Facts**

12. On July 25, 2019 this Court sentenced Mr. Haynes to six months incarceration for his convictions for Conspiracy to Commit Wire Fraud and Filing a False Return. This short term was to be followed by three years of supervised release, the first six month with a special condition home confinement.

13. This sentence represented a substantial departure from the advisory sentencing guideline range of 27 to 33 months. The Court based its sentence on an application of 18 U.S.C. § 3553 (a).

14. Prominent in the Court's calculus was the severe medical issues that Mr. Haynes suffered from and the consequences of these issues on Mr. Haynes and his family[4].

---

- Avoid crowds as much as possible
- Avoid non-essential travel
- Clean and disinfect your home and car regularly, especially items you touch often like doorknobs, light switches, cell phones, car door handles and steering wheels, etc.

[4] Other mitigating factors, cited by the defense, were Mr. Haynes' minimal role in the

4

15. These medical conditions were documented in the PSR (¶¶ 128-130 Dkt Entry # 230 p. 27) as well as Exhibits KK and supplement in Defendant's Sentencing Memorandum (Dkt Entry # 177).

16. In summary, Mr. Haynes suffers from "lasting medical issues" stemming from injuries sustained in August 2015 when he was involved in a motor vehicle crash in which his car was rear-ended on a Florida expressway.

17. Mr. Haynes sustained severe injuries to his back, shoulder and neck which, to date, have required four surgeries, the last of which occurred in June 2018[5]. He had his first rib removed, and a portion of his second rib surgically broken and a portion of his front and middle scalene muscle in his chest removed. These surgeries were an attempt to address his diagnosis of arterial and recurrent neurogenic thoracic outlet syndrome, a rare medical condition.

18. As a result, Mr. Haynes has little, if any, blood flow to his arms when they are in a raised position. He is under medical restrictions not to lift more than five pounds and not to sit for more than thirty minutes without breaks. (See Letter from Dr. Robert W. Thompson attached hereto as **Exhibit KK**, [PSR ¶¶ 127-29]). Mr. Haynes continues under medical treatment on a complicated medication regimen which also addresses his high blood pressure[6] that has arisen during his medical treatment.

19. Recently, Mr. Haynes' wife, concerned about the onslaught of the COVID-19 virus and her husband's history of shortness of breath, reviewed his medical records and provided me

---

conspiracy (conceded by the government) his lack of record, his treatment of mental health issues and a long list of character testimonials.

[5] Mr. Haynes also underwent arthroscopic surgery of his shoulder on June 28, 2019 which further complicated his medical condition.

[6] On November 17, 2019 I provided MPC a list of medications that Mr. Haynes had been prescribed that he would have upon his surrender on November 19, 2019 (a copy of this letter attached hereto as **Exhibit C**)

the radiologist report associate with these surgeries indicating documented evidence of lung scarring and lung collapse[7]. It should be noted that the subsequent surgeries that removed the first ribs on both sides of the lungs may have exacerbated the fragility of Mr. Haynes lungs and chest muscles.

20. I immediately faxed these records, along with an explanatory cover letter, to MPC on April 8, 2020 and have received no response.

21. There can be no doubt as to the severity of Mr. Haynes medical issue. Nor can there be any doubt as to the increased risk of harm or death that his condition subjects him to if he were to contract COVID-19. I expect that the government will concede this issue.

## RAPID RISE OF DOCUMENTED COVID CASES IN BOP

22. On March 11, 2020, the World Health Organization ("WHO") officially classified the spread of COVID-19, the disease caused by the novel coronavirus, as a pandemic.[8] On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 *et seq*.[9] Several days later, the White House issued guidance recommending that gatherings of ten or more persons be canceled or postponed.[10]

---

[7] Exhibit B
[8] "WHO Characterizes COVID-19 as a Pandemic," World Health Organization (March 11, 2020), available at https://bit.ly/2W8dwpS.
[9] The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.
[10] Sheri Fink, "White House Takes New Line After Dire Report on Death Toll," New York Times (March 17, 2020), available at https://www.nytimes.com/2020/03/17/us/coronavirus-fatality-rate-white-house.html?action=click&module=Spotlight&pgtype=Homepage.

23. Public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[11] "Prisons are petri dishes for contagious respiratory illnesses."[12]

24. The potential for prisons to be epidemiological epicenters is especially acute in a pandemic spreading across the nation. In a *national* pandemic a *national* system of inter-related prisons poses an obvious and alarming danger. Inmates cycle in and out of BOP pretrial and detention facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening or testing.

25. Without surprise to public health professionals, the BOP has been exposed as an incubator and breeding ground for COVID-19 transmission. The news stories emerging from the federal prisons are disheartening, and reinforce the point that by the time BOP acts with regard to Jason Haynes it may be too late:

- Multiple inmate deaths at low-security FCI Oakdale in Louisiana. *See* Sadie Gurman, Zusha Elinson, & Deanna Paul, *Coronavirus Inside Oakdale Prison: 'Our Sentences Have Turned Into Death Sentences*,' Wall Street J. (Apr. 6, 2020).[13]

- Positive tests for BOP staff at least twenty different facilities. *See* Bureau of Prisons, *COVID-19 Coronavirus Information* (Apr. 6, 2020, 2:25 pm Central).[14]

- 138 COVID-19 positive BOP inmates at 28 different facilities. *Id.*

---

[11] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

[12] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. *See also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[13] https://www.wsj.com/articles/inside-oakdale-prison-our-sentences-have-turned-into-death-sentences-11586191030.

14. https://www.bop.gov/coronavirus

26.     The data maintained by BOP itself regarding documented COVID-19 cases reveal in stark terms the inexorable and exponential rise in *documented* cases among inmates and staff[15].



27.     This data shows that the risk of infection of BOP inmates or staff increases daily. And the *rate* of increase soars on a day-by-day basis.  Thus the danger to Jason Haynes, as he sits in a federal prison in Montgomery, grows day-by-day as he awaits action or even a response by either MPC or MDC.

28.      From a coldly analytical basis, each day matters.  The numbers themselves are undeniable as the following chart illustrates:

---

[15] The BOP data of documented COVID-19 cases has been subjected to wide-spread skepticism regarding its accurate portrayal of the true incidence of the virus in the federal prisons.

Percentage of Increase of Infected BOP People (Inmates and Staff) Since 3/20/2020[2]

| Date | Number of BOP Cases | BOP Percentage Increase Since 3/20/2020 | National Percentage Increase Since 3/20/2020 | Number of U.S. Cases |
|---|---|---|---|---|
| 3/20/2020 | 2 | 0% | 0% | 18,747 |
| 3/21/2020 | 3 | 50% | 31% | 24,583 |
| 3/23/2020 | 6 | 200% | 135% | 44,183 |
| 3/24/2020 | 9 | 350% | 190% | 54,453 |
| 3/26/2020 | 18 | 800% | 355% | 85,356 |
| 3/27/2020 | 27 | 1250% | 451% | 103321 |
| 3/29/2020 | 38 | 1800% | 651% | 140904 |
| 3/30/2020 | 52 | 2500% | 772% | 163539 |
| 3/31/2020 | 59 | 2850% | 892% | 186101 |
| 4/1/2020 | 94 | 4600% | 1036% | 213144 |
| 4/2/2020 | 114 | 5600% | 1176% | 239279 |
| 4/3/2020 | 141 | 6950% | 1379% | 277205 |
| 4/4/2020 | 174 | 8600% | 1526% | 304826 |
| 4/5/2020 | 197 | 9750% | 1665% | 330891 |
| 4/6/2020 | 259 | 12850% | 1845% | 364723 |

29.    Each day matters. And it matters greatly to Jason Haynes and his family as they await action or even a response from the BOP or MPC. They can't wait any longer and thus turn to this Court.

**Barr Memorandum**

30.    In response to the increased danger posed by the rate of infection at BOP prisons, Attorney General Barr issued a Memorandum to the Director of the Bureau of Prisons on April 3, 2020[16]. In this Memo, Attorney General Barr called for the BOP to *immediately* maximize

---

[16] A copy of this memo is attached hereto as Exhibit D.

appropriate transfers to home confinement for all appropriate inmates at Oakdale, Elkton, Danbury and "other similarly situated" BOP facilities.

31. It should be noted that FCI Oakdale is a low security prison located in Oakdale Louisiana. It has erupted with infections of staff and inmates resulting in multiple hospitalizations and deaths. Montgomery Prison Camp, a low security facility like Oakdale, is located approximately 450 miles to the east sharing the same type of inmate population and climate. It is under any yardstick "similarly situated" to Oakdale.

32  These inmates to be immediately released under the Barr memo obviously include those who are non-violent, who owe a short portion of their remaining sentences, who have a clean institutional record and an appropriate residence to be released or confined to. These inmates would obviously include Jason Haynes, who should have released under this memo no later than April 3, 2020, if not earlier. He has a residence in Ormond Beach, Florida that has already been inspected and evidently cleared by the Probation Department of the Middle District of Florida as suitable for home confinement.

33. In the face of these facts, the BOP has done nothing regarding Mr. Haynes' immediate release. Its inaction is inexplicable, if not inexcusable. In any event, this lack of response comprises the backdrop for the "extraordinary and compelling" circumstances requiring judicial intervention in Mr. Haynes' case under 18 U.S.C. § 3582(c)(1)(A)

## "Compassionate Release"

### A. History of Compassionate Release before First Step Act

34. On December 21, 2018, the President signed into law the First Step Act, which, among other things, made significant changes to the statute governing compassionate release, 18 U.S.C. § 3582(c)(1)(A)(i). The statute was first enacted as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" to enable judges to re-assess whether a sentence

10

reduction was warranted by factors that previously would have been addressed through the abolished parole system. S. Rep. No. 98-225, at 121 (1983).

35. The compassionate release statute empowers courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Congress delegated to the U.S. Sentencing Commission ("Commission") the responsibility of defining what were "extraordinary and compelling reasons." *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples.").

36. In 2007, more than two decades after the statute was enacted, the Commission responded. It issued a guideline stating that "extraordinary and compelling reasons" include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, comm. n.1(A).

37. As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the Bureau of Prisons. But, during the span of more than three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria. *See, e.g.,* Dept. of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (April 2013), at 11, available at https://oig.justice.gov/reports/2013/ e1306.pdf ("The BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."); Dept. of Justice, Office of the Inspector General, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons (May 2015), at 51, available at https://oig.justice.gov/ reports/2015/e1505.pdf#page=1 ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which

11

could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it."); U.S.S.G. § 1B1.13, n.4 (admonishing BOP for its past failure to pursue relief on behalf of eligible inmates).

38. In Response Under 18 U.S.C. § 3582(c)(1)(A), a defendant ordinarily must exhaust administrative remedies with the BOP, or wait 30 days after submitting a request for compassionate release to the warden, whichever comes first. 18 U.S.C. § 3582(c)(1)(A). However, the court may waive these administrative exhaustion requirements, and should do so here. See, e.g., *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004).

A. **Compassionate Release Before the First Step Act**

39. On December 21, 2018, the President signed into law the First Step Act, which, among other things, made significant changes to the statute governing compassionate release, 18 U.S.C. § 3582(c)(1)(A)(i). The statute was first enacted as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" to enable judges to re-assess whether a sentence reduction was warranted by factors that previously would have been addressed through the abolished parole system. S. Rep. No. 98-225, at 121 (1983).

40. The compassionate release statute empowers courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Congress delegated to the U.S. Sentencing Commission ("Commission") the responsibility of defining what were "extraordinary and compelling reasons." *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). In 2007, more than two decades after the statute was enacted, the Commission responded. It issued a guideline stating that "extraordinary and compelling reasons" include

medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, comm. n.1(A).

41. As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the Bureau of Prisons. But, during the span of more than three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria. *See, e.g.,* Dept. of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (April 2013), at 11, available at https://oig.justice.gov/reports/2013/ e1306.pdf ("The BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."); Dept. of Justice, Office of the Inspector General, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons (May 2015), at 51, available at https://oig.justice.gov/ reports/2015/e1505.pdf#page=1 ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it."); U.S.S.G. § 1B1.13, n.4 (admonishing BOP for its past failure to pursue relief on behalf of eligible inmates).

**B. Compassionate Release <u>After</u> the First Step Act**

42. Through the First Step Act, Congress sought to resuscitate compassionate release by, *inter alia*, allowing defendants to directly petition courts for relief, rather than leaving that power solely in the hands of the BOP. *See* 18 U.S.C. § 3582(c)(1)(A). The compassionate release statute, as amended by the First Step Act, authorizes courts to grant relief whenever "extraordinary and compelling reasons" warrant a reduction, consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a) and applicable policy statements issued by the Commission—regardless of the BOP's position.

43. Thus, courts no longer need to await a motion from the BOP, which tended to limit "extraordinary and compelling" circumstances to cases where the defendant suffered from a terminal illness. Instead, courts may amend a sentence "upon motion of the defendant" after he has exhausted administrative remedies with the BOP, or after 30 days following the warden's receipt of a compassionate release request, whichever comes first. 18 U.S.C. § 3582(c)(1)(A).

44. Considering the First Step Act's objective to increase courts' flexibility to grant compassionate release and minimize the BOP's role in the process, courts are no longer constrained by the BOP's determination of when relief is warranted. This is because those portions of the Commission's policy statement delegating to the BOP Director the power to decide what are "extraordinary and compelling reasons" are in conflict with the amended statute. *See, e.g., United States v. Cantu*, 2019 WL 2498923, at *3-4 (S.D. Tex. June 17, 2019) (vesting BOP with authority to determine whether extraordinary and compelling reasons are present "no longer describes an appropriate use of sentence-modification provisions and is thus not part of the applicable policy statement binding the Court"); *United States v. Ebbers*, 2020 WL 91399, at *4 n.6 (S.D.N.Y. Jan. 8, 2020) ("[T]he First Step Act reduced the BOP's control over compassionate release and vested greater discretion with courts. Deferring to the BOP would seem to frustrate that purpose.").

45. Now that power lies where Congress intended: in the courts. And, in the one-year span since the First Step Act took effect, courts have significantly expanded the scope of compassionate release, finding "extraordinary and compelling reasons" in circumstances wholly apart from, or in combination with, the limited factors on which the BOP narrowly relied (age, medical condition, and family needs):

- *United States v. Owens*, No. 97-CR-2546-CAB, ECF No. 93 at 4 (S.D. Cal. Mar. 20, 2020) ("In the wake of the First Step Act, numerous courts have recognized the court can determine whether extraordinary and compelling reasons exist to modify a sentence

— and may do so under the 'catch all' provision similar to that recognized in U.S.S.G. Manual § 1B1.13 n.1(D), that is, 'an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)' relating to prisoner health or family relations." (citation and internal quotation marks omitted));

- *United States v. Redd*, No. 1:97-cr-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he Court joins other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) . . . .");

- *United States v. Perez*, No. 88-10094-JTM, 2020 WL 1180719, at *2 (D. Kansas Mar. 11, 2020) ("Since the passage of the First Step Act, however, a majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it. . . . The United States agrees that this is the majority view. . . . As a majority of district courts have concluded, this court concludes that it has the authority to exercise the same discretion as the BOP when weighing a request for compassionate relief." (internal citations and quotations marks omitted));

46. As these cases illustrate, now that courts are no longer constrained by the BOP's narrow interpretation of "extraordinary and compelling reasons," they have embraced their broad discretion under § 3582(c)(1)(A) to grant compassionate release.

### D. "Extraordinary and Compelling" Reasons Allow the Court To Waive the Exhaustion Requirement

47. Under 18 U.S.C. § 3582(c)(1)(A), a defendant ordinarily must exhaust administrative remedies with the BOP, or wait 30 days after submitting a request for compassionate release to the warden, whichever comes first. 18 U.S.C. § 3582(c)(1)(A). But these are not ordinary times, and this not an ordinary case as demonstrated by Jason Haynes' unique vulnerability to harm or death from the COVID virus.

48. Jason Haynes did not submit an application for compassionate release until April 6, 2020. Given his short sentence, and his evident suitability to early release to home confinement under FSA, there was no reason to do so any earlier. He submitted his application for compassionate release because of the inaction by MPC and BOP. In the face of this inaction, to

require him to wait another 30 days for BOP would be futile, and even more importantly dangerous to Mr. Haynes in light of his compromised health and increased vulnerability. This danger increases every day.

49. The court has the authority to waive these administrative exhaustion requirements, and should do so here. *See, e.g., Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004) (under Prison Litigation Reform Act, 42 U.S.C. § 1997(e), where the prisoner "did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements," permitting the court to waive the failure to exhaust) (quotation marks and citations omitted).

50. Indeed, it is well settled that the term "exhausted" in administrative law includes "well-established exceptions to exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1863 (2013) (citing *Woodford v. Ngo*, 548 U.S. 81, 103 (2006); *see Sims v. Apfel,* 530 U.S. 103, 115 (2000) (Breyer, J., joined by Rehnquist, C. J., and Scalia and Kennedy, JJ., dissenting) (recognizing futility, constitutional claims as exceptions); *Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 13 (2000) (futility); *McKart v. United States*, 395 U.S. 185, 197-201 (1969) (hardship); *McCarthy v. Madigan*, 503 U.S. 140, 147-148 (1992) (inadequate or unavailable administrative remedies); *see generally* II R. Pierce, Administrative Law Treatise § 15 (4th ed. 2002); *Malouf v. SEC*, 933 F.3d 1248 (10th Cir. 2019) (security law includes exhaustion exception under "reasonable" circumstances); *Singh v. Barr,* 400 F.Supp.3d 1005, 1013 (S.D. CA 2019) (waiving administrative exhaustion for redetermination of bond decision under 8 C.F.R. § 1003.19(e) because "no relevant circumstances have changed").

51. Thus, when a defendant--such as Jason Haynes--is facing irreparable harm and futility if exhaustion is required, courts have waived exhaustion of administrative remedies in the context of compassionate release.

52. In the compassionate release context, courts have recognized that under the right circumstances, seeking relief from BOP may be futile, warranting the waiver of a defendant's failure to exhaust administrative remedies—including the unique circumstances created by the onslaught of COVID-19. *See, e.g., United States v. Powell*, No. 1:94-cr-316-ESH (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust remedies in light of open misdemeanor case).

53. These exceptions are rooted in common sense and experience, as strict application of the exhaustion requirement can sometimes lead to absurd and altogether unfair results. To illustrate the point: "If it takes two weeks to exhaust a complaint that the complainant is in danger of being killed tomorrow, there is no 'possibility of some relief' and so nothing for the prisoner to exhaust." *Fletcher v. Menard Correctional Center*, 623 F.3d 1171, 1174 (7th Cir. 2010).

54. The futility and potentially-irreparable harm of requiring Mr. Haynes to exhaust his administrative remedies would only compound the risk he will be exposed to COVID-19, a disease that has spread exceptionally quickly. If Mr. Haynes were to contract the disease while awaiting an administrative response, it would likely come too late, leaving him in grave danger and rendering his compassionate release motion moot.

55. This is not the first case where a defendant has had to petition for compassionate release before he or she has had the opportunity to exhaust her claims. Recently in the wake of the COVID-19 crisis, other courts in this Circuit have recognized these exceptions and granted relief:

> • "Thus, in light of the urgency of Defendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the Court waives the exhaustion requirement of Section 3582(c)(1)(A)." *United States v. Colvin,* 19-cr-179 R.38 (D. Conn April 2, 2020).

17

• "Requiring exhaustion, therefore, would be directly contrary to the purpose of identifying and releasing individuals whose circumstances are "extraordinary and compelling. Accordingly, the Court holds that Perez's undisputed fragile health, combined with the high risk of contracting COVID-19 in the MDC, justifies waiver of the exhaustion requirement." *United States v. Perez,* No. 17 CR. 513-3 (AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020).

56.   Both *Perez* and *Colvin* are instructive cases regarding the waiver of the exhaustion requirement because both focus on the short time remaining in the defendants' sentences, the health issues of the defendants and the risk of continued confinement for the duration of the sentence. Mr. Haynes case presents these factors as compellingly, if even not even more so than *Perez* and *Colvin*.

### D.  The Relevant § 3553(a) Sentencing Factors Warrant Mr. Haynes his Immediate Release and Serving the Remainder of His Sentence on Home Confinement

57.   Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must consider the relevant sentencing factors of 18 U.S.C. §3553(a) to determine whether a sentencing reduction or modification is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).

56.   Under all of the circumstances in this case, the Court should conclude that the imprisonment that Jason Haynes has already served is sufficient to satisfy the purposes of sentencing.

57.   Here, Mr. Haynes compromised physical health, and the unique danger he faces of contracting COVID-19 and becoming severely ill, when combined with the other Section 3553(a) sentencing factors, clearly warrant relief.

58.   In addition, Mr. Haynes poses no danger to the community and has a suitable residence already inspected for home confinement purposes. His wife, a registered nurse, is

18

available at a moment's notice to transport Mr. Haynes immediately to Ormond Beach, Florida to the situs of his home confinement.

59. Given the nature and circumstances of the offense and Mr. Haynes's history and characteristics, the § 3553(a) factors supports his motion for compassionate release. In this case, a reduction or modification of Mr. Haynes's sentence would not diminish the seriousness of the offense, nor would it place the public in any danger. The extraordinary and compelling circumstances presented by the uncontrolled spread of COVID-19—compounded by the heightened risks faced by Mr. Haynes, whose ability to engage in basic self-protective measures is restricted—warrant a reduced or modified sentence.

60. The above circumstances set forth ample evidence of "extraordinary and compelling reasons" to grant Mr. Hayne's motion for compassionate release. Given the day-to-day increased jeopardy to Mr. Haynes, and the protracted unresponsiveness of BOP, the Court should do so immediately.

**WHEREFORE,** for the foregoing reasons, Mr. Haynes respectfully requests that this Court grant his Motion for Compassionate Release, immediately release him, and reduce his term of imprisonment to time served or allow him to serve the remaining weeks in home confinement and grant such further relief as the Court deems just and proper.

**DATED**: Rochester, New York, April 10, 2020.

Respectfully submitted,

/

**/s/William T. Easton**
William T. Easton
Easton Thompson Kasperek Shiffrin, LLP
16 W. Main Street, Suite 243
(585) 423-8290
wteaston@etksdefense.com

To:  Richard A. Resnick
     Assistant United States Attorney